for argument is John Doe 2 v. President John W. Rosa. Ms. Edgerton, when you're ready. May it please the Court. My name is Jackie Edgerton and I represent the appellants Doe 2 and Mother Doe on behalf of Doe 3 in these cases against John Rosa, President of the Citadel, which had been consolidated for appeal. The District Court granted summary judgment to President Rosa. Surviving at summary judgment were the Doe's claims that President Rosa violated their substantive due process rights actionable under 42 U.S. Code 1983. Specifically, that President Rosa took affirmative state actions to maintain the anonymity of a skip or bill. And that those actions thereby created the risk that the boys would be sexually abused thereafter. The District Court erred in its application of state created danger doctrine. Let me ask you this. Do you think under the state created danger doctrine under substantive due process that Mr. Rosa would have to take an affirmative action? He would have to do something affirmatively? Yes, Your Honor. And would that action have to affirmatively, that affirmative action would have to either create the danger or enhance the danger? Yes, Your Honor. Do you think he created it by his actions or he enhanced it? Your Honor, I believe the evidence at summary judgment establishes that he did both. At summary judgment we have testimony. All right, let me ask this. What action that he took do you think is the strongest, offers the strongest proof of an affirmative action by him? What one may say there's several, but what would be the strongest evidence of an affirmative action that would fall in the category to help your case? I will answer your question with one action, Your Honor. I do believe there are several, though. I acknowledge that you probably do, but what is the strongest one, do you think? Yes, Your Honor. I believe the strongest evidence of President Rosa's affirmative action is his appearance before the Board of Visitors. The Board of Visitors is the appointed entity who has the authority to govern and supervise the Citadel. Is that the Board of Trustees? It's actually a board of appointed individuals who do make the policies for the Citadel. So they have actions and authority, if not more so than President Rosa does. But is that a board? Do you have a board of trustees at the Citadel too? Your Honor, I'm not sure if there is also a board of trustees, but these are individuals appointed by the government. So he did what before then? He appeared before the Board of Visitors in June as well as September of 2007 with his subordinate, Mark Brandenburg, where Mark Brandenburg presented to the Board what this complaint was. I'm asking what the President himself did. Did the President say anything to the Board of Visitors about this case? No, and that's what he did, Your Honor. He sat idly by, knowing the full details of the complaint of the sexual abuse by Reveal, and instead sat idly by while Mark Brandenburg briefed the Board and led them to believe that this was a complaint of a father upset that his son didn't get into the Citadel and uniformly walked away, not understanding that they were briefed on abuse. Well, you have a lot of cases, though, from DeShaney to Pender on down and lots of other circuits that say that an omission to act, a simple failure to act, isn't going to fall within the state-created danger doctrine. That is correct, Your Honor. So how is this any different? Here, President Rosa acted in violation of his own school's policies, and even though that is something that, you know, when you have in place a policy that tells you to do X, Y, Z, here it was telling President Rosa to turn Reveal over to public safety. This is the college president who is faced with multiple policies telling him to turn Reveal over to public safety, and he does not do that, as well as he has a school policy telling him that any employee that is accused of sexual misconduct will not be allowed to resign in lieu of a full investigation. But your strongest argument I've heard so far, you may have others, but your strongest argument about what Rosa did is that he did nothing at the board meeting. And doing nothing as... I know, but it's that he did nothing. He sat idly by, yes, Your Honor. So this is not a case where President Rosa spoke out to the board and actively told them, here is what the sexual abuse complaint was. Instead, he sat there and allowed his subordinate to... How is that different from the social workers who didn't take the child back into their care, and DeShaney or the police officer who, after he said that the individual wasn't going to be out of jail, then charged him for a lesser offense that allowed him to get out and go back and burn the house up and pender? How is this any different from those actions? In that case, the police officer wasn't acting in accordance or against any policies. That was just out of his own free will to warn the woman or tell the woman that the man would be incarcerated that evening and she could leave her children and go back to work. Here you have President Rosa's actions taken against multiple policies. We have testimony... Well, you're saying it was an inaction, his failure to act. No, Your Honor. I would not characterize it as a failure to act. I would say that he acted when he didn't do what his school policies told him to do. I would also say that there's Jennifer Scheel's testimony, which at summary judgment, the credibility of testimony to be taken in the administrative assistant who worked within the President's office. Her testimony is that from the beginning, President Rosa orchestrated the concealment of this complaint. He orchestrated the decisions and just because he can have his subordinates carry out his intent does not insulate him as the ultimate decision maker. Can we... Let's assume going back to the Board of Visitors meeting. The Board of Trustees meeting and I was trying to decide how to characterize it. But apparently, according to the complaint, one of the difficulties I'm having is your complaint alleges that Rosa is charged with knowledge of the incident in July of 2007. Is that correct? And that's when the board... This was at the time of the board meeting? President Rosa had knowledge of the sexual abuse complaint no later than May 6, 2007. That comes from Mark Brandenburg's testimony. Okay. And I'll go back and look at the complaint. But even at that point, had not plaintiff's abuse been ongoing for two years? Is there any allegation that Rosa's conduct or lack of conduct exacerbated the situation after that point? Yes, Your Honor. That is the claim. That President Rosa's actions intervened that prior existing danger that the boys faced by Reveal and for the harm they incurred in May, June, July, and August of 2007. Yeah, but how is that any different or any worse than what they'd endured for the previous two years? It's incredibly horrible whenever it was. It's just that for the summer months... There's no doubt it's a horrible, terrible thing. But this had been ongoing for a long, long time before any of the events you recite in your complaint with regard to President Rosa occurred. So the question is how, just to take the language right out of DeShaney and Pender, how did his failure to act put those children in any worse position than they were already in? They were specifically at risk of sexual abuse in those summer months because had President Rosa acted in accordance with his school's policies and had not fired Reveal within 24 hours of the complaint coming in, sent him out the door without a record in his employment file, Reveal would have been in custody with the police and the boys would not have been sexually abused. They had already been sexually abused. I thought that Judge Agee's question was how did the horrendous circumstances exacerbated by the address the board? Yes, Your Honor. The claim is that President Rosa is responsible for that specific time period of abuse. The boys did face abuse before. Whether the abuse... It would go to damages as to whether that abuse in and of itself... Let me read you the language from the district court. Simply put, plaintiff cannot demonstrate that defendant created or substantially enhanced the danger which resulted in this tragic abuse at the hands of Reveal. In the absence of such evidence, plaintiff's claim under 1983 is barred by DeShaney because defendant cannot be said to have created a danger which already existed. And here, Your Honor, the situation is very similar to this court's recent decision in Robinson v. Loy, if I'm pronouncing that correctly. Here, the danger in Loy existed prior to the wife being killed by her husband. Undisputably, she was at risk of domestic violence. There was an assault warrant out against her husband. The defendant in that case, in effect, became a very active co-conspirator. He took a personal direct relationship with the perpetrator and enabled him to avoid arrest because he wouldn't serve the warrant. It counseled him on how to avoid arrest so that he could remain at large in the actions. There were clearly affirmative actions and they weren't simply omissions. Here, Your Honor, President Rosa, as the president and because he was the orchestrator of the actions, he had the ability to have his subordinates carry out his intent. Mark Brandenburg and Colonel Trez warned Reveal of the complaint. They fired him within 24 hours of that sexual abuse coming in the building. He was out the gates of the Citadel without a trace of the complaint in his record against policy. He was not turned into law enforcement per policy. The fact that President Rosa was able to act through his subordinates should not and does not insulate him from his own decision making and his culpable conduct for being the orchestrator of that. Is that your effort to get around the bar on respondeat superior in this area of a case against Brandenburg under any circumstances, let's say. But you agree that Rosa can't be charged with the actions of Brandenburg in this case, correct? Absolutely, Your Honor, and this is not a charge of respondeat superior. President Rosa is responsible for his own actions, but the fact that as someone who sits in an ultimate seat of authority and has the power... Can't somebody in the ultimate seat of authority just be a, I'm just saying, be a complete slacker and just doesn't care? Can't that happen? Absolutely. And then that person would not, as bad as it is under this doctrine, they would not be responsible, would they? They would not be responsible, Your Honor. President Rosa is responsible because he was an active participant, because he directed his subordinates to carry forth his intent and his direction. And their intent was what? What did he do to show that intent in your mind? His intent was... I don't know what did he do to show it, I said. We have the testimony of Jennifer Scheel, that President Rosa, based on her experience from the get-go, that it was his intent to conceal this complaint and to conceal Ravel's pedophilia, as well as maintain an apparent ignorance of the citadel of this pedophile. We have Mark Brandenburg, who's testified that he kept President Rosa updated throughout the process. We have documentation that shows that President Rosa specifically knew the details of these complaints. We know that President Rosa, as I stated at the beginning, appeared before the Board of Visitors fully knowing the intricacies of these complaints, yet sitting there and allowing the Board... Let me ask this. We talked about danger and enhancement. What do you think the danger is in this case? Wasn't the danger that these boys were going to be around someone, that the boys are around someone who wants to abuse them, is that the danger? The danger is, yes, facing... Then now, did the President create that? He did, because it was his actions that kept Ravel out of police custody and unknown in the community as a pedophile, and instead known as a... Well, see, I thought you would call that that he enhanced the danger. The danger was already there. They're already being abused. I thought you would say he enhanced that danger by letting it extend for a longer period of time. Does that matter to your theory, or does it not? I believe under the state-created danger theory, it's whether the state actor creates or substantially increases the risk, and I believe President Rosa's actions did both. It was his particular actions that maintained Ravel free in the community and able to abuse for that set time period. To make your best argument, once again, it sounds to me like your argument is largely responding as superior, and it also sounds to me your argument is inaction is action, and neither responding as superior nor inaction seems to justify the application of this doctrine. President Rosa is liable for his actions, not the actions of his subordinates. His subordinates acted at his direction... And his action was what? Orchestrating the cover-up? That's it? It was violating policies in place that told him to turn Ravel into law enforcement. It was disguising the complaint in internal files. He disguised it? He disguised it? The evidence at summary judgment is that they have been disguised, and there's evidence at summary judgment as well that President Rosa was behind the concealment, so the reasonable inferences is that President Rosa was behind the disguising in those files. And the evidence of the concealment came from the administrative assistant. That's the evidence. These are specific documents that were in internal files. No, I thought, where's the evidence of his actions or intent to conceal? Yes, Your Honor, from Jennifer Shiel from her personal experience working with President Rosa in his office. Okay. Furthermore, President Rosa also acted against Title IX. He misused action, abused his state authority in the handling of the camper's complaint. That flouting of Title IX establishes his lack of a justifiable state interest behind his actions. The district court erred in its application of state-created danger doctrine. Let me take you back to the enhancement of the danger. What was different, what was enhanced about the abuse the children faced after the complaint says Dr. Rosa became aware of Mr. Ravel's actions and what happened before? What was enhanced during the period that you would claim that you're entitled to relieve? What was enhanced was that they were subject to sexual abuse. Right, but what was enhanced, what was different in that period than what had gone on the previous couple of years? The abuse was the same. However, the abuse was because President Rosa had violated his own policies that prevented Ravel from being arrested. Just like in Loy, the police officer who violates the own policies, warns the husband and pretends he can't find the warrant. Those acts kept the woman. She had faced danger from her husband at his hands prior to Officer Loy's actions. However, Officer Loy is liable for his own actions that specifically kept the husband out of police custody. Here, President Rosa specifically acted to keep Ravel out of police custody, and it was those actions that he can be held liable for under Section 1983. And I see that my time is up. You've reserved some time. Thank you, Your Honor. Thank you very much. Mr. Cook. Thank you. If it please the Court, the plaintiffs are keenly aware of the need to portray President Rosa as an active participant in Skip Reveal's heinous abuse of his victims in order to come within the very narrow state-created danger, exception to the general rule, that a state official does not violate the constitutional rights of a private citizen by failing to protect him from the criminal acts of another private citizen. There is no evidence in this record, and there is no evidence anywhere, that anybody at the Citadel, least of all President Rosa, did anything intentionally to cause or enable Skip Reveal to molest the plaintiffs. There is no evidence that anybody at the Citadel even knew these plaintiffs. At best, the plaintiffs have presented evidence of an incomplete investigation of what was at that time in 2007, a report of sexually inappropriate conduct that had taken place some five years earlier in a camp that no longer Mr. Cook. Mr. Cook, had the President, and I'm not saying he did, I said had he taken a deformative step to tell everybody at the Citadel, nobody say a word about this, no reporting, we're supposed to report, but we're not going to report. Had he done that, would what happened to the boys after that point have sufficed for creating or enhancing danger to those boys for this doctrine? No, Your Honor. There would still be several hurdles that the plaintiffs would have to overcome. No, I'm not asking about that. I'm asking about the question of what happened to the boys. I'll try to give you something we could agree on. Let's just take, then, for the purpose of this argument. You and I agree, for the purpose of this argument, that the President of the school took an action which qualifies as an affirmative action under this doctrine and, therefore, everything's in play, except the question is what resulted. Was that creating a danger or enhancing or substantially enhancing, whatever that language is? Would what happened to those boys suffice for that element of the claim? Only if President Rosa had specifically agreed with Skip Reveal for the specific purpose of allowing him, enabling him to molest these plaintiffs. What does that mean? You mean if he had said, I know you're a sex offender, but I'm not going to take action so you can go and take advantage of those boys more? That would be required? If he knew who these specific boys were, I believe that that would create a cause of action. There's a case from another circuit where a police officer was known to be applying to be a foster parent and was known to be reading pornography and so forth, and there they said that that survived a motion to dismiss. So you would say that what happens to these boys after the fact in this case would be sufficient as far as danger or enhancement of danger had the requisite actions been in place between the time the settler learned about them or the settler had some idea about them and the time they did nothing? I think I understand what you're asking. I don't think this case should turn on the fact that these children were already being molested before General Rosa. I didn't ask you that. I think what you told me is that you think that what happened to those boys after the time of the operative facts in this case would be sufficient for danger to have been created or enhanced by the operative facts if they had not, if they don't come out the right way. Is that right? I may be misunderstanding the question. I believe that if President Rosa had actually specifically intended for these boys to be molested, then the fact that they had been molested previously would not excuse his conduct. But under the slaughter case, he would have to have specifically intended the injury to these specific people. Can we say that's specific to these people? What about people in general? I haven't found a single state-created injury danger case where it was simply a danger to the public. Every single case where a claim was allowed to proceed, there was an identified victim. The Leoli case is a perfect example of that, where there was actually an arrest warrant arising out of the assault of the plaintiff in that particular case. The officer specifically knew what this person had done, what he was under an arrest warrant for, and who he had done it to. The President of the Citadel didn't, is his name Reveal? Is it pronounced Reveal? We've never figured that out. It's either Reveal or Revile or Reveal, but we'll call it Reveal. Vile might be better, but we'll call it Reveal. But didn't Reveal, didn't the Citadel put Reveal in a circumstance to be involved with boys through the Citadel camp? Didn't they do that? Well, way back in 2002. I'm saying that, but isn't that correct? That's a renowned camp for boys, prestigious, desirable camp, and the Citadel put this person around boys from that area of the state, really, correct? And then, as things turn out later, if the Citadel were to find out, if Rosa were to find out this is a sex abuser who molested little boys, young boys, that would make out some danger to those people in the area because that Pinewood school is what, 30, 40 miles away, 20 miles away? It's within the Charleston area, right? It is. So your view of this doctrine is, although he was introduced to boys generally through the Citadel's auspices, the president of the Citadel finds out he's a danger, he doesn't have to do anything unless he knows the specific victim? Well, I mean that. I mean, that may be reading of the law, but I'm asking, is that how you see it? I would agree with that. I would agree with that proposition. That there is no obligation. That's correct, to the public in general. And if you were to hold otherwise, why would we limit it to college presidents? Why not impose a duty on police officers? And this court spoke eloquently in the Pender case about why we don't want to create that duty. Why not extend it to elementary school principals and guidance counselors? And why limit it to sexual abuse? Why not any crime that you encounter and you realize that? Well, under the facts, it might well be extended. I don't know. Well, it would just be far beyond. I mean, every time this court has considered or any court has considered from DeShaney to Pender to Slaughter to any of these cases, they've always looked at what are called the floodgates. And I don't mean to interrupt you, but I want to ask you something more specific, and I'm sure the other judges probably do, too. What do you make of the other side's argument about no respondee at Superior, but they were just actors carrying out his general plan or his actions? What do you make of that? Well, there's no evidence to support that. And, you know, we know from the – What about his statement of his administrative assistant? Well, it wasn't his administrative assistant. That was Jennifer Scheel, who had been an administrative assistant to the general counsel. Now, what the plaintiffs do, they finesse this by saying, well, she's in the president's office. Well, everybody in the administration is in the president's office writ large. I mean, she was on a different floor in a different office. But if you read her testimony, she has no knowledge. I mean, she's – I'm not going to – for summary judgment purposes, we don't need to talk about credibility. But all she said was that there was a general policy of keeping this kind of thing close hold. And when she was pressed on what does close hold mean, she says it would not be disclosed to anybody who doesn't have a reason to know. Well, in the college world, almost everything is treated that way under FERPA. And certainly, when you're dealing with a complaint of an allegation of sexual abuse or abuse to a child, of course, everything, every investigation would be kept close hold within that terminology. She doesn't testify that she had any interaction whatsoever with President Rosa. She didn't hear him say keep this quiet or let's push this under the rug or anything like that. What she heard was that this, like any other investigation like this, would be kept close hold, and that is disclosed only to people who had a need to know. You know, the irony is that there are three things that cut against this being reported by anybody, let alone General Rosa. One is that the complainant was an adult at this time. And the Citadel, being a college, we didn't even have a summer camp in 2007 any longer. So they deal generally with older people. And their sexual assault policy says that the victim gets to decide what is done with the complaint. And like it or not, that's what Title IX tells us we're supposed to do in colleges. And so that's the background that Mark Brandenburg and that anybody else would have dealt with. Second, General Rosa had no way of – The Office of Civil Rights has a guidance that really doesn't relate so much to this case, but the Office of Civil Rights has a dear friend guidance letter that says differently now. It does now. It didn't then, but it does now. There have been quite a few guidances that have come out since then, and I guess one of these days you might get to decide how it applies. In 2007, people didn't even think Title IX applied to ancillary operations like a summer camp. But we've learned a lot since then, which is beside the point. Not to get you off your train, but I took it from your brief. This was not an alternative grounds of decision by the district court, but I took it from your brief. One of your arguments was that regardless of the application of the legal doctrine in DeShaney et al. to the facts that came out on summary judgment, you had an alternative position that there was simply a failure of proof on the part of the plaintiffs to show any action by President Rosa, correct action. Is that accurate? That's exactly – I'm sorry, I didn't mean to interrupt. That's exactly correct. Judge Gergel made his decision based on the previous molestation, and we would respectfully submit, and if we're fortunate enough that the court agrees with us, we would hope that your opinion would be broad enough because Reveal said he molested some 51 children, so this would be important guidance to other potential claimants. We call them the downstream claimants who had no relationship to the Citadel, did not go to the summer camp, were not molested in any way because of the fact that Skip Reveal had been at the summer camp, which goes partly to Judge Shedd's question. General Rosa received the same reports when he attended the Board of Visitors meeting. He's hearing the same thing from his general counsel regarding his investigation. The question of whether we report this to the police was never even presented to General Rosa, and I call him General or President interchangeably, President Rosa, for his decision. He didn't even know that this family had not reported it to the police. He didn't even know that Skip Reveal was working as a counselor at the Writing Center in 2007. He had nothing whatsoever to do with the fact that Skip Reveal had resigned, and that Skip Reveal had already submitted his resignation before this report ever came. General Rosa had nothing to do with the terms of his resignation, the fact that it was under mutual agreement. This case is much weaker for the plaintiffs than the facts of the DeShaney case. What about this case? The President put a close hold on this, didn't he? Not personally, and Jennifer Schill didn't testify. He personally did. She said it was known within the office that this type of thing should be held close hold. She didn't say that he instituted it? I don't believe she testified. If he instituted it, let's just say for a second he did institute it. What about that combined with the fact that the Citadel, having some idea this guy was a sex offender, didn't fight his unemployment? Well, first of all, there's no evidence that General Rosa even knew he had applied for unemployment, let alone ordered that it not be filed. You know what, though, but you need to let me answer my question. I'm sorry. Why doesn't that create the impression that both create the impression, why doesn't it establish that the President, if he did it, took steps to keep this information concealed, number one, and number two, that the institution he runs, isn't he ultimately responsible for everything that happens at the Citadel? Isn't he? Not under 1983. He's not ultimately responsible for the administrative actions under his authority, both at the school and in the military? He's not responsible? He is responsible, but there's no respondeat superior liability. I didn't say that was. And so the institution that he runs does not fight the unemployment benefits for this man. Now, let me ask this. Had, in fact, it not been closely held information so other people knew, and by the way, isn't all this on the heels of a gigantic sex offender lawsuit and settlement by the Citadel? Yes. Hundreds, I don't know, hundreds of kids, just lots of people. Well, there were five. Okay, but there were apparently in that and with this summer camp complaints from early on, there was that going on. The President knew that, didn't he? He did. He knew that. And then he close holds information that looks like it may be another sex issue. And then he, the Citadel, the Citadel, I don't know who runs the Citadel if he doesn't, the Citadel doesn't fight unemployment benefits where this might come out in a public forum. That looks, at least carries some indicia that the Citadel did something and Rosa himself did something to keep information about what y'all knew about this guy and his propensity from being made public, isn't that? That doesn't fit within the doctrine at all, factually, in this case, or legally. Neither, neither, Your Honor, if I may. May I address it? Sure. I'm summing up here. And before, and I have a question. You had talked about summing up and I just wanted to throw that out there so you'd know. Oh, he's not done yet. He's going to wait this for a while. And I'm happy to answer questions as long as you have them. But, all right, so just to address your question, no, that's a non sequitur. First of all, Reveal never got unemployment compensation. Nobody's ever found who made that decision within the Budget and Control Board not to appeal it. But the evidence shows that by the time that decision was made, he had already run out of benefits anyway. So there was no reason. But the only reason he should not get benefits is because he voluntarily resigned his position. No, I'll say this. That is a little bit of a leap, admittedly, because it's not, nothing in this record indicates that information would have come out. Right, right. What about Rosa and the close hold? He did institute a close hold. And that would be an innocent explanation for his leaving, that he voluntarily resigned. No, I'm going to the close hold now. Okay, the close hold is standard operating procedure. It's virtually anything that would be investigated. I know that, but let me ask you this. If it's so standard, if, in fact, Rosa instituted one here, doesn't that suggest it's not standard operating procedure? I go back to what I said. I don't think there's any testimony that he specifically instituted that anybody saw him or that heard him specifically instituted for this case. I believe what Jennifer Shield testified was that it was generally understood within the office that this kind of thing should be held close hold. You know, it's ironic that General Rosa would be accused of this. The very first thing he did when he arrived at the Citadel was blow the lid off of underreporting of sexual assaults on campus. Well, it looks like he did it in this case. Somebody under his authority did it in this case. The Citadel had information. Brandenburg had information. In fact, I even wonder back to when, wasn't there some suggestion this guy was in a room rubbing down some camper's legs or something and that wasn't even really followed up on? So, quite frankly, there's information in this record as to what Rosa did and didn't do that I don't think puts him on any pedestal. Even that was taken out of context, and General Rosa had no knowledge of that until everything blew up in 2011. That occurred way back in 2002. Is this the 2002? There's a lot of, we're talking about a lot of different things, and one of the questions, I'm sorry, go ahead. Well, he was a runner. He was in a room that was not, the door was not closed, and this was actually a. . . Who are we talking about now? This was the rubbing the liniment incident back in 2002. Who's the runner? This is Reveal you're talking about? Reveal was a runner, and this particular individual who was not a camper, he was a minor, but he was a junior counselor, and they had been running together, and Reveal was putting some kind of liniment on his leg. The door was open, but the plaintiffs in our cases have said, well, there is evidence that he's molesting a camper, and that's taken out of context, but General Rosa had no knowledge of that, and this is a perfect example of how you can put together bits and pieces. . . No, it's not, not for purposes of my question, because you talk about it's astounding that this happened to Rosa when he blew the lid off. I'm just saying to you, it's purely information in this record that Reveal has a problem, purely in this record. Vandenberg believed that to be the case, don't you think? He was suspicious of it. Right. And so to say, gosh, it's terrible what's happened to Rosa, what all he's done, but his general counsel knew there was a problem. Now, maybe his general counsel just couldn't use words clearly enough to tell the president. Maybe he didn't tell him on purpose. I don't know, but I don't think it's a fair way to say that the president here is getting a bum rap because he's done so much. Isn't there evidence in this record that at the time Rosa was president, this time, that the Citadel had at least some suspicion that Reveal, there was some question about how he conducted himself. Absolutely. Sexually abusing children. That's true. But the complaint was from an adult. It was five years old. It related to a program that no longer existed at the Citadel. It was under investigation. And the misdirection in this case, and this was not General Rosa's fault, it was certainly not a 1983 violation, was it was regarded as a civil claim being made by the family. That's because you regarded it as a civil. That's because that's what the Citadel said. The Citadel gives information about a sexual predator, and they go, you know what? It's just civil. That's what the Citadel did. I'm not saying Rosa did that. But the Citadel, there's not any suggestion that, I mean, isn't it clear that was a Citadel's way to name this as civil? Citadel doesn't get credit for saying it wasn't a big deal because it was merely a civil complaint. Citadel's the person, Citadel's the operation that decided to call it civil, right? Well, that's true, although the family treated it that way. I do, to leap in here. It does seem to me undisputed that the record reflects that April 23rd, 2007, a parent of a former camper called to report the abuse of a child at a summer camp in 2002. Correct. Is that correct? And at that point, Brandenburg and an executive assistant met with Ravel and traveled to the Texas home of the camper and conducted an in-depth interview. So there was a response to the, there was a pretty immediate response to the phone call. And I suppose we've all been on educational boards and know the trouble you can get into either way if you make something public when you don't have sufficient information of an investigation, then you can be sued on both sides of the coin. So it isn't clear to me that Brandenburg, and there's nothing that I can tell that suggests that this was La Rosa's, La Rosa was out of town, actually. Correct. So there was some investigation undertaken. And then when did the board meet relative to the investigation? Well, the board never met to make any decisions. They received a report in their June meeting and their September meeting of the ongoing investigation by Mr. Brandenburg. And they were told what, that there was an investigation ongoing? Right, and that he was dealing with the Insurance Reserve Fund, which is the insurer of the Citadel, and was working with them. But by then, this camper was 19 years old. He was there with his parents, and Mr. Brandenburg made the mistake of believing that the family wanted this handled privately. General Rosa never knew that the family wanted otherwise. He would say, and he said in his deposition, he said, if I had something to do over again, I would have called the family to make sure that we were doing what they wanted. If I may. So what's the difference between a state-created danger, which is what the doctrine is technically called, and a state-enhanced danger, which seems to be a gloss on that? In the cases that I've looked at, and I apologize, my time's over, but in the cases, there's really no qualitative difference between those, but they all require active participation and active intent by the actor to create that or enhance that risk. Thank you. You don't think there's any danger between the terms created danger and enhanced danger? I think they're degrees on the same scale. But isn't that when the danger's already there, not created by the state actor, but the state actor does something to enhance the danger that's already there, that's the difference, isn't it? Deliberately. For example, in the Loy case, that would be an example of the danger was already there. The ex-boyfriend had the intent to do harm, but there the police officer deliberately enhanced that danger by warning him, by pretending that he lost the war. And by the way, you said a few responses ago, a few sentences ago, that that's the way the parents wanted to handle. That's the Citadel's spin on that, isn't it? The parents, maybe I'm wrong, but I think I have it about right, they said, what do you want done? And the camper's family said, we want to be sure this doesn't happen again. And then the Citadel said, that just means he wants to be sure that nobody at our school gets affected. That wasn't, and then didn't he later say, no, I meant by that, I thought y'all were going to do something about it. If I knew y'all wanted the Citadel, I would have taken it to the authorities. So isn't that Citadel putting its best, its spin on what? I don't mean spin in a negative sense. Its interpretation on what that meant. May I expand on that briefly? Sure. Mr. Brandenburg specifically asked, and this is in the interview, specifically asked, have you reported this to law enforcement? They said, well, we're telling you. He said, I'm not wearing a badge. I'm here representing the Citadel. They specifically said that we want compensation. They specifically said that we want our son to be, we want the Citadel to be a part of the solution to his problem, because he'd had such a bad academic record. They wanted him to help him get into the Citadel. That's what they asked for. Did they say, we want to be sure this doesn't happen again? They did say that. So they said that, too, didn't they? They did say that. How were they going to do that if they didn't report it to authorities? What was the Citadel going to do? You know, five years went by. No, no, no, I'm asking, but, no, I'm just talking about what Citadel, because it looks to me in this case, whether or not you've crossed that threshold, I'm not clear. But the Citadel, sure, along the way, and I understand one problem is some of this is not Roosevelt. Some of it is. The Citadel was taking steps they always, in light of that sex scandal that had just happened, maybe because of it, they put it in a light that's sort of favorable to them. Didn't Rosa fail to read the transcript of the Brandenburg interview with the camper in Texas? He didn't even know there was a transcript until 2011. And Judge Duncan is right. In many of these cases, you're darned if you do, darned if you don't. But this was one complaint of somebody who otherwise had an exemplary record, and it was in the process of investigation. And it's not, it's for argument for a different day of whether the investigation was good enough. No corroboration was found. The Citadel is not a mandatory reporter under South Carolina law relating to child abuse. I was going to ask you that. They're not a mandatory reporter. They're not. Okay. Thank you very much. Thank you. Thank you. Ms. Agerton, you've reserved some time. Thank you, Your Honor. To follow up on the last point about mandatory reporter, this is not a duty case. This is a case about holding someone liable for their own actions. Also, Jennifer Shield, her testimony. It sounded like, though, you were making it a duty case when you referenced the Citadel's personnel policies in Title IX, that the president of the Citadel had a duty under the personnel policies and under Title IX, and he failed to fulfill that duty. It sounded like you were making that argument. Well, distinguishable from a duty that's in place, I guess that's more of an amorphous duty. Or here you have someone who the policies that were in place are evidence of him. Well, what was the amorphous duty then? Was the Title IX amorphous? Was the Citadel's personnel policies amorphous? I'm not sure I understood what you were saying. President Roe says affirmative actions taken counter to the Citadel's policies, taken counter to Title IX, those are affirmative actions. And I'm still not clear, what in those affirmative actions were not expounded, were not bringing the subject of an ongoing investigation to the board? That was not turning Reveal over to Public Safety, which was in several Citadel policies that suspected crime was to go to Public Safety, and that's a law enforcement entity on the campus. Although what was being investigated was an event that occurred in 2002, and as I read the record, Reveal left campus voluntarily after the initial contact with him. So he was no longer on campus. Your Honor, I would disagree with the record. It actually establishes with the inferences in the favor of the Doe's for summary judgment that Reveal was ordered off of campus by Mark Brandenburg, directed and orchestrated by President Rosa, within 24 hours of that complaint coming in. Is there any evidence in the record that the departure was orchestrated by Rosa? I didn't see anything in that regard, and it may just be that I didn't see it. But as I read it, and apparently as the district court read it too, Brandenburg met with Reveal and was directed to leave the campus by Brandenburg, and then Brandenburg traveled to Texas to the home of the camper. Yes, Your Honor. So you're saying it is, your argument is that it is inferable that those actions were taken with Rosa's support? At the direction of Rosa, based on Jennifer Shields' testimony, and I would remark that Joint Appendix 975 deals with Jennifer Shields' testimony that there was a conscience effort to cover up Reveal that was orchestrated by President Rosa. And I understand, all I'm asking, with respect to the initial phone call, which came in on April 23rd, when Rosa, Due to technical difficulties beyond our control, the last four minutes of this oral argument was not recorded.
judges: Dennis W. Shedd, Allyson K. Duncan, G. Steven Agee